UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION
CIVIL ACTION NO.  3:21-CV-00014-CHL

JEFFREY SCOTT H.[1],                                                                  Plaintiff,

v.

COMMISSIONER OF SOCIAL SECURITY,                                   Defendant.

## MEMORANDUM OPINION AND ORDER

Before the Court is the Complaint (DN 1) of Plaintiff Jeffrey Scott H. (the "Claimant"),

seeking judicial review of the final decision of the Commissioner of Social Security (the

"Commissioner").  *See* 42 U.S.C. § 405(g).  On September 24, 2021, Claimant filed his fact and

law summary, (DN 19), and on January 10, 2022, the Commissioner filed her fact and law

summary in response.  (DN 24.)  The Parties have consented to the jurisdiction of a Magistrate

Judge to enter judgment in this case with direct review by the Sixth Circuit Court of Appeals in

the event an appeal is filed.  (DN 16.)  Therefore, this matter is ripe for review.

## I.    FINDINGS OF FACT

On January 18, 2015, Claimant protectively filed applications for Disability Insurance

Benefits ("DIB") and Supplemental Security Income ("SSI") alleging that he was disabled as of

January 1, 2014.  (R. at 476.)  After these applications were denied initially and again on

reconsideration, Administrative Law Judge D. Lyndell Pickett ("ALJ Pickett") conducted a

hearing on the applications on October 30, 2017.  (*Id.*)  During the hearing, ALJ Pickett heard

testimony from Claimant, who was assisted by counsel, and from vocational expert Linda K Jones.

(*Id.*)  In a decision dated January 30, 2018, ALJ Pickett engaged in the five-step evaluation process

---

[1] Pursuant to General Order 22-05, the Plaintiff in this case is identified and referenced solely by first name and last
initial.

promulgated by the Commissioner to determine whether an individual is disabled, and in doing so, made the following findings:

1. The claimant meets the insured status requirements of the Social Security Act through September 30, 2019.

2. The claimant has not engaged in substantial gainful activity since January 1, 2014, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3. The claimant has the following severe impairments: degenerative disc disease, migraine headaches, coronary artery disease, hypertension, chronic obstructive pulmonary disease (COPD), asthma, obstructive sleep apnea, carpal tunnel syndrome, and obesity (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. . . . [T]he claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except he could never crawl or climb ladders, ropes, or scaffolds; he could occasionally balance, stoop, kneel, crouch, or climb ramps or stairs; he could occasionally have exposure to extreme cold or heat, humidity, fumes, odors, dusts, gases, or poor ventilation; he could never have exposure to hazards such as unprotected heights or dangerous machinery; he should be in an environment with a noise level of three or less as defined in the SCO; and he could frequently handle, finger, or feel with the bilateral upper extremities.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was . . . 39 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8. The claimant has a limited education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.  Transferability of job skills is not material to the determination
    of disability because using the Medical-Vocational Rules as a
    framework supports a finding that the claimant is "not disabled,"
    whether or not the claimant has transferable job skills (See SSR
    82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and
    residual functional capacity, there are jobs that exist in
    significant numbers in the national economy that the claimant
    can perform (20 CFR 404.1569, 404.1569(a), 416.969, and
    416.969(a)).

(*Id.* at 479–89.)

Claimant requested review of ALJ Pickett's decision, and on August 27, 2018 the Appeals
Council denied the request, making ALJ Pickett's decision the final decision of the Commissioner.
(*Id.* at 498.)  Claimant filed a complaint for judicial review in this Court, and in a judgement dated
November 15, 2019, United Stated District Judge Claria Horn Boom affirmed the decision.  (*Id.*
598.)  Claimant did not seek appellate review.

Meanwhile, following the Commissioner's final decision on Claimant's 2015 applications,
Claimant again protectively filed applications for DIB and SSI on February 17, 2018.[2]  These
applications were denied initially on December 5, 2018 and again on reconsideration on April 12,
2019.  (*Id.*  603, 609, 616.)  On November 20, 2019, ALJ Neil Morholt ("ALJ Morholt") conducted
a hearing on the applications.  (*Id.* at 436–72.)  During the hearing, ALJ Morholt heard testimony
from Claimant, who was assisted by counsel, and from vocational expert Tina Stambaugh.  (*Id.*)
In a decision dated December 13, 2019, ALJ Morholt engaged in the five-step evaluation process
promulgated by the Commissioner to determine whether an individual is disabled, and in doing
so, made the following findings:

---

[2] In their respective fact and law summaries, Claimant lists February 17, 2018 as the protective filing date whereas the
Commissioner lists September 21, 2018.  (DN 19, at PageID #1587; DN 24, at PageID # 1614.)  In his decision, ALJ
Morholt, like Claimant, notes February 17, 2018 for the protective filing date.  (R. at 11.)  The Court need not resolve
these discrepancies because the protective filing date does not bear on any of the issues in dispute.

1. The claimant meets the insured status requirements of the Social Security Act through September 30, 2019.

2. The claimant has not engaged in substantial gainful activity since February 1, 2018, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3. The claimant has the following severe impairments: degenerative disc disease; migraine headaches; coronary artery disease; hypertension; chronic obstructive pulmonary disease (COPD); asthma; obstructive sleep apnea; carpal tunnel syndrome; obesity; bipolar disorder; and panic disorder (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. . . . [T]he claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except he can: never climb ladders, ropes, or scaffolds; occasionally balance, stoop, kneel, crouch, and climb ramps or stairs; occasionally have exposure to extreme cold or heat, humidity, fumes, odors, dusts, gases, or poor ventilation; can never have exposure to hazards such as unprotected heights and dangerous machinery; and should be in an environment with a noise level of three or less as defined in the SCO. The claimant can frequently handle, finger, or feel with the bilateral upper extremities. Mentally, he can: understand and remember simple and detailed instructions; sustain attention for simple tasks for two-hour periods before the need for a regularly scheduled break; and occasionally interact with supervisors, coworkers, and the general public.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was . . . 43 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8. The claimant has a limited education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from February 1, 2018, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(*Id.* at 13–21.)

Claimant requested review of ALJ Morholt's decision, and on November 5, 2020, the Appeals Council denied the request, making ALJ Morholt's decision the final decision of the Commissioner. (*Id.* at 1.) On January 8, 2021, Claimant timely filed this action. (DN 1.)

## II. CONCLUSIONS OF LAW

### A. Standard of Review

The Court may review the final decision of the Commissioner, but that review is limited to whether the Commissioner's findings are supported by "substantial evidence" and whether the Commissioner applied the correct legal standards. 42 U.S.C. § 405(g); *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997). "Substantial evidence" means "more than a mere scintilla"; it means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). The Court must "affirm the Commissioner's decision if it is based on substantial evidence, even if substantial evidence would also have supported the opposite conclusion." *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 374 (6th Cir. 2013); *see Smith v. Sec'y of Health & Human Servs.*, 893 F.2d 106, 108 (6th Cir. 1989) (holding that if the Court determines the ALJ's decision is supported by substantial evidence, the court

"may not even inquire whether the record could support a decision the other way").  However, "failure to follow agency rules and regulations" constitutes lack of substantial evidence, even where the Commissioner's findings can otherwise be justified by evidence in the record.  *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011).

### B.  Five-Step Sequential Evaluation Process

The Commissioner has promulgated regulations that set forth a five-step sequential evaluation process that an ALJ must follow in evaluating a disability claim.  20 C.F.R. § 404.1520 (2021).[3]  In summary, the evaluation process proceeds as follows:

1.  Is the claimant involved in substantial gainful activity? If the answer is "yes," the claimant is not disabled.  If the answer is "no," proceed to the next step.

2.  Does the claimant have a medically determinable impairment or combination of impairments that satisfies the duration requirement[4] and significantly limits his or her physical or mental ability to do basic work activities?  If the answer is "no," the claimant is not disabled. If the answer is "yes," proceed to the next step.

3.  Does the claimant have an impairment that meets or medically equals the criteria of a listed impairment within 20 C.F.R. Part 404, Subpart P, Appendix 1?  If the answer is "yes," the claimant is disabled. If the answer is "no," proceed to the next step.

4.  Does the claimant have the residual functional capacity ("RFC") to return to his or her past relevant work?  If the answer is "yes," then the claimant is not disabled.  If the answer is "no," proceed to the next step.

5.  Does the claimant's RFC, age, education, and work experience allow him or her to make an adjustment to other work?  If the answer is "yes," the claimant is not disabled.  If the answer is "no," the claimant is disabled.

---

[3] The regulations governing DIB are located in Part 404 of Title 20, and parallel regulations governing SSI are located in Part 416 of Title 20.  The pertinent text of the two sets of regulations is identical, and in the interest of brevity, references to the regulations throughout this Memorandum Opinion and Order cite only to Part 404.

[4] To be considered, an impairment must be expected to result in death or have lasted/be expected to last for a continuous period of at least twelve (12) months.  20 C.F.R. § 404.1509 (2021).

20 C.F.R. § 404.1520(a)(4).

The claimant bears the burden of proof with respect to Steps 1 through 4.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).   However, the burden shifts to the Commissioner at Step 5 to prove that other work is available that the claimant is capable of performing.  *Jordan v. Comm'r of Soc. Sec.*, 548 F.3d 417, 423 (6th Cir. 2008).   The claimant always retains the burden of proving lack of RFC.  *Id.*; *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 392 (6th Cir. 1999).

### C. *Drummond/Earley*

Because Claimant had previously applied for DIB and SSI and ALJ Pickett issued a written decision, ALJ Morholt considered in his decision whether he was bound by ALJ Pickett's prior findings according to the standards set by the Sixth Circuit in *Drummond v. Comm'r of Soc. Sec.*, 126 F.3d 837 (6th Cir. 1997).  *Drummond* stands for the proposition that principles of res judicata are binding on both claimants and the Commissioner and that where "the Commissioner has made a final decision concerning a claimant's entitlement to benefits, the Commissioner is bound by this determination absent changed circumstances."  *Id.* at 842.   In recognition of this ruling, the SSA issued AR 98-4(6) directing those within the Sixth Circuit to follow that holding.  SSAR 98-4(6), 63 Fed. Reg. 29,771 (June 1, 1998).  AR 98-4(6) explains:

> When adjudicating a subsequent disability claim with an unadjudicated period arising under the same title of the [Social Security] Act as the prior claim, adjudicators must adopt such a finding from the final decision by an ALJ or the Appeals Council on the prior claim in determining whether the claimant is disabled with respect to the unadjudicated period unless there is new and material evidence relating to such a finding . . . .

*Id.* at 29,773.  The Sixth Circuit recently clarified that when considering a subsequent disability claim for a new period of disability, an ALJ is permitted to review prior ALJ findings but is not

bound by them. *Earley v. Comm'r of Soc. Sec.*, 893 F.3d 929, 933–34 (6th Cir. 2018). In considering a successive application that covers a new period of disability, a subsequent ALJ should take a "fresh look" at the new record to determine if a claimant's condition has worsened or new evidence changes previous analysis. *Id.* at 931. However, the Sixth Circuit cautioned that a successive applicant who offers "no new evidence after a failed application . . . should not have high expectations about success." *Id.* at 933. It noted, "What's past likely will be precedent in that setting—as indeed it should be in a system designed to apply the law consistently to similarly situated individuals." *Id.* at 933–34.

Here, at the outset of his decision, ALJ Morholt identified the barrier Claimant had to overcome in order for a new determination to be made in his second application, stating that he "may not make different findings in adjudicating this claim for a subsequent claimed period of disability unless new and additional evidence or changed circumstances after the date of the prior decision provide a basis for re-examining issues that were previously determined." (R. at 13.) At Step 4, ALJ Morholt acknowledged that his findings with respect to Claimant's RFC differed from ALJ Pickett's and explained that "the findings in this decision differing from the prior decision are not barred based on new evidence in the current record with regards to the severity of claimant' s mental impairments." (*Id.* at 19.) Claimant does not raise any challenges concerning the application of *Drummond* and *Earley*.

### D. Claimant's Contentions

Claimant contends that ALJ Morholt erred at Step 4 in making his RFC determination. (DN 19, at PageID # 1588–92.) An ALJ's RFC finding is the ALJ's ultimate determination of what a claimant can still do despite his or her physical and mental limitations. 20 C.F.R. §§ 404.1545(a)(1), 404.1546(c), (2021). The ALJ bases his or her determination on all relevant

evidence in the case record, including statements from medical sources.  20 C.F.R. §§ 404.1529 (2001); 404.1545(a)(1)–(4).  Thus, in making his or her determination of a claimant's RFC, an ALJ must necessarily evaluate the medical opinions in the record and assess the claimant's subjective allegations.  20 C.F.R. § 404.1527 (2021); 20 C.F.R. § 404.1529(a).  Here, at Step 4, ALJ Morholt considered the extent to which Claimant's allegation of disabling symptoms was consistent with the evidence in the record.  (R. at 16–19.)  In doing so, ALJ Morholt concluded that Claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms, but that Claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms were not consistent with the record.  (*Id.* at 16.)  ALJ Morholt found that evidence admitted to the record after ALJ Pickett rendered his decision did "not demonstrate[] any material worsening in [Claimant's] physical impairments" but did show "newly-onset severe mental impairments" that justified greater mental RFC restrictions than ALJ Pickett found.  (*Id.* at 16–17.)  Claimant challenges the ALJ's findings with respect to both his physical and mental RFC.  (DN 19, at PageID # 1589–93.)

### 1. Physical RFC

In assessing the alleged symptoms that Claimant attributes to his physical impairments, ALJ Morholt considered the medical evidence, including that "[C]laimant's ongoing treatment has been limited to inhaler use and steroid injections in his neck and lower back, with visits since the alleged onset date primarily consisting of . . . medication management appointments."  (R. at 16.)  He further noted that Claimant's treatment records over the relevant period "include repeatedly normal musculoskeletal exams overall and stabilized respiratory function with conservative treatment."  (*Id.* at 16–17) (citations omitted).  Finally, ALJ Morholt noted that the records over that period "show[] no discussion of chest pain and no complaints of headaches."  (*Id.* at 16.)  ALJ

Morholt also considered the opinion evidence and prior administrative findings in the record, including the medical reports of state agency reviewing consultants P. Saranga, M.D. ("Dr. Saranga") and Stephen Kavka, M.D. ("Dr. Kavka").  (*Id.* at 18.)  In their respective April 10, 2019 and November 19, 2019 physical function evaluations they found that Claimant was limited to occasionally lifting/carrying up to 20 pounds; frequently lifting/carrying up to 10 pounds; standing/walking up to 4 hours; sitting up to 6 hours; occasionally climbing ramps/stairs, stooping, kneeling, crouching, and crawling; never climbing ladders/ropes/scaffolds; avoiding concentrated exposure to extreme cold, humidity, and vibration; and avoiding all exposure to fumes, odors, dust, gases, poor ventilation, and hazards.  (*Id.* at 540–41; 563–65.)  ALJ Morholt found their opinions persuasive only to the extent that they were consistent with his and ALJ Pickett's RFC determinations.  (*Id.* at 18.)  ALJ Morholt explained that the opinions:

> are mostly supported by relevant citations to the record and generally consistent with the evidence as a whole. While the consultants failed to consider the prior ALJ decision, their findings differ only slightly and, to that extent, are largely consistent with the medical evidence of record that demonstrates ongoing lumbar injections, the need for inhaler use, and continued obesity. Even so, the consultants' omission of frequent handling, fingering, and feeling bilaterally, as defined by the prior ALJ, warrants additional consideration because of the claimant's combination of continued cervical injections and nonsevere carpal tunnel syndrome. In light of the fact that there has been no documented worsening in the claimant's physical condition, the undersigned has determined that the record continues to support physical limitations corresponding to the previous ALJ's decision.

(*Id.* at 18.)

As is set forth in his Finding 5, ALJ Morholt adopted ALJ Pickett's physical RFC determination.  (*Id.* at 16, 18.)  Claimant argues that this RFC does not properly account for medical evidence of more severe respiratory impairment nor the medical opinions of the state

agency reviewing consultants who found greater functional limitations.  (DN 19, at PageID # 1589–91.)

### i.   Medical Evidence of Respiratory Impairment

Claimant argues that ALJ Morholt "fail[ed] to properly examen [sic] and consider medical evidence from Aijaz Yazdani, M.D., documenting a worsening in Mr. Hensley's breathing."  (*Id.* at 1590.)  As an initial matter, Claimant does not cite any authority or otherwise identify how such failure constitutes a reversible error.  Accordingly, the Court construes Claimant's argument, consistent with his general objection to Finding 5, that ALJ Morholt's finding of no substantial worsening of Claimant's respiratory impairment was not supported by substantial evidence.

The Court has reviewed the pertinent medical evidence generated after ALJ Pickett's January 30, 2018 decision that was in the record at the time of ALJ Morholt's December 13, 2019 decision.  On March 6, 2018, Claimant appeared for treatment with a lung specialist provider and was seen by Aijaz Yazdani, M.D. ("Dr. Yazdani").  (R. at 965, 1042.)  Claimant was noted as "complaining of more cough congestion and he is coughing up yellow and white sputum."  (*Id.*)  Claimant was also noted as reporting "shortness of air on exertion and activity" and that his symptoms had occurred "for the last few weeks . . . ."  (*Id.*)  Upon examination, Dr. Yazdani found Claimant's throat clear, with indications of sleep apnea and "very broad uvula."  (*Id.* at 966, 1043.)  Findings concerning his lungs were "normal."  (*Id.*)  Dr. Yazdani concluded, "Currently it appears that he had an exacerbation of his COPD which is bothering him . . . ."  (*Id.* at 965, 1042.)  Dr. Yazdani noted, "Due to his continued symptoms with shortness of air coughing and coughing up phlegm despite using all the current inhalers including Dulera, I am planning to change the latter with Bevespi, which she [sic] will use two inhalation twice a day with a spacer."  (*Id.* at 966, 1043.)  Claimant was ordered to follow up in three months.  (*Id.* at 967, 1044.)

On March 24, 2018, Claimant presented to urgent care "with a chief complaint of consistent (but worse at times) cough of the chest since Sat, Mar 17, 2018" and was noted as describing "the severity as moderate."   (*Id.* at 1267.)   He was marked as negative for symptoms including congestion, shortness of breath, and wheeze.  (*Id.*)  He was diagnosed with acute upper respiratory infection and prescribed antibiotic and antiinflammation medications.  (*Id.* at 1266–67.)  On June 11, 2018, Claimant again presented to urgent care "with a chief complaint of consistent (but worse at times) cough of the chest since approximately Fri, Jun 08, 2018" and was noted as describing "the severity as moderate."   (*Id.* at 1361.)   He was marked as negative for symptoms including congestion, shortness of breath, and wheeze.  (*Id.*)  He was prescribed antibiotic, antihistamine, and antiinflammation medications and received an immune suppressant injection, which he "tolerated [] well."  (*Id.* at 1360–61.)

On June 21, 2018, Claimant returned for treatment by Dr. Yazdani and reported "increasing symptoms with upper airway cough syndrome and sinus drainage nasal congestion and postnasal drip which is causing him to have more cough and is coughing up more which is dark brown yellow sputum."  (*Id.* at 969, 1046.)  He further reported "developing more shortness of air on exertion and activity which is chronic in nature it is intermittent in nature severity is moderate exacerbated by exertion and relieved by rest Levi inhalers."  (*Id.*)  Upon examination, Dr. Yazdani found Claimant's throat clear, with indications of sleep apnea and "very broad uvula."  (*Id.* at 970, 1047.)  Claimant's lungs were found with "[s]cattered sibilant rhonchi with crackles."  (*Id.*)  Just as he did in the March 24, 2018 treatment notes, Dr. Yazdani noted, "Due to his continued symptoms with shortness of air coughing and coughing up phlegm despite using all the current inhalers including Dulera, I am planning to change the latter with Bevespi, which she [sic] will use two inhalation twice a day with a spacer."  (*Id.*)  Claimant was ordered to follow up in three

months. (*Id.* at 971, 1048.)  On June 27, 2018, Claimant returned for treatment by Dr. Yazdani. (*Id.* at 973, 1050.)  It was noted that Claimant was unable to start on an antibiotic treatment due to drug interaction with his mood stabilizing medications.  (*Id.*)  Claimant reported that "[h]is breathing is [] still worse and he is getting significant shortness of air on activity and exertion." (*Id.*)  Dr. Yazdani noted that Claimant "[i]s not coughing up any sputum yellow-green, there is no hemoptysis, he does not have any significant sinus drainage sinus congestion, no chest pain or chest discomfort."  (*Id.*)  Upon examination, Dr. Yazdani found Claimant's throat clear, with indications of sleep apnea and "very broad uvula."  (*Id.* at 974, 1051.)  Claimant's lungs were found with "[s]cattered sibilant rhonchi with crackles." (*Id.*)  Dr. Yazdani prescribed a bronchodilator medication in lieu of the previously prescribed antibiotic, instructed Claimant to quit smoking, and ordered him to follow up in two months.  (*Id.* at 975–76, 1051–52.)

On August 24, 2018, Claimant presented to urgent care "with a chief complaint of constant cough of the chest since approximately Tue, Aug 21, 2018."  (*Id.* at 1077.)  He was marked as negative for symptoms including congestion and wheeze and was diagnosed with acute bronchitis. (*Id.*)  He was prescribed antibacterial and antiinflammation medications and received an immune suppressant injection.  (*Id.* at 1076–77.)  On Sept 13, 2018, Claimant again presented to urgent care "with a chief complaint of constant (but worse at times) chills since Mon, Sept 10, 2018," and "describe[d] the severity as moderate."  (*Id.* at 1073.)  He was marked as negative for symptoms including congestion, shortness of breath, and wheeze.  (*Id.*)  His diagnosis was again noted as acute bronchitis, and he was prescribed antibacterial and antiinflammation medications and received an immune suppressant injection, which he "tolerated [] well."  (*Id.* at 1072–73.)

On October 19, 2018, Claimant presented to his primary care provider.  (*Id.* at 1258.) Claimant reported fatigue and denied "chest pain/pressure, dyspnea, edema, exercise intolerance,

fatigue, orthopnea[,] . . . cough, [] pleuritic pain, productive sputum and wheezing." (*Id.* at 1259.) Upon examination, auscultation revealed "overall: breath sounds clear bilaterally." (*Id.*)

On October 29, 2018, Claimant returned for treatment by Dr. Yazdani and reported "doing pretty well with his breathing is using all his inhalers and medications regularly including theophylline and they're benefiting his respiration." (*Id.* at 1288, 1470.) He further reported "shortness of air on moderate exertion and activity which is intermittent in nature gets worse with exertion gets better with rest severity is mild to moderate to nature[,] [] coughing up some thick his sputum which is white and yellow in color[,] . . . [and] that he wakes up at least 6-7 times a month due to coughing and wheezing despite using all his inhalers and medications regularly." (*Id.*) Upon examination, Dr. Yazdani found Claimant's throat clear, with indications of sleep apnea and "very broad uvula." (*Id.* at 1289, 1471.) Claimant's lungs were found with "[s]cattered sibilant rhonchi with crackles." (*Id.*) Dr. Yazdani prescribed an increased dose of Claimant's bronchodilator medication, instructed him to quit smoking, and ordered him to follow up in four weeks. (*Id.* at 1289–90, 1471–72.)

On November 5, 2018, Claimant presented to his primary care provider for bloodwork. (*Id.* at 1265.) He was noted as having acute sinusitis with an onset date of May 14, 2018. (*Id.* at 1269.) On November 13, 2018, Claimant presented for a pulmonary function study. (*Id.* at 1282.) His forced vital capacity was recorded at 74% and his forced expiratory volume at 79%. (*Id.*) He was noted as having "mild [r]estriction w[ith] [n]o obstruction." (*Id.*) On January 3, 2019, Claimant presented to a radiology provider for a chest exam. (*Id.* at 1314.) The following findings were recorded: "The cardiomediastinal silhouette is within normal limits. The lungs are clear. There is no focal consolidation, pneumothorax or large pleural effusion." (*Id.*)

14

On January 15, 2019, Claimant presented to his primary care provider and was noted as denying "chest pain/pressure, dyspnea, edema, exercise intolerance, fatigue, orthopnea[,] . . . cough, [] pleuritic pain, productive sputum and wheezing." (*Id.* at 1304, 1443.) Upon examination, auscultation revealed "overall: breath sounds clear bilaterally." (*Id.*)  On the same day, Claimant returned for treatment by Dr. Yazdani and reported "taking all his inhalers and medications regularly including his theophylline and he is getting benefit and feeling better with them." (*Id.* at 1288, 1474.)  He also reported "restarted coughing up some yellow greenish sputum, no hemoptysis." (*Id.*)  Claimant reported that he had not been regularly taking his prescribed bronchodilator medication, "but now he is taking it regularly." (*Id.*)  Dr. Yazdani prescribed an additional course of medication "to confirm that his level is therapeutic." (*Id.*)  Upon examination, Dr. Yazdani found Claimant's throat clear, with indications of sleep apnea and "very broad uvula." (*Id.* at 1289, 1475.)  Claimant's lungs were found with "[s]cattered sibilant rhonchi with crackles." (*Id.*)  Dr. Yazdani instructed Claimant to quit smoking and ordered him to follow up in four weeks. (*Id.* at 1290, 1476.)

On January 18, 2019, Claimant appeared to his radiology provider for CT imaging of his chest.  (*Id.* at 1319.)  The following findings were recorded:

> The great vessels, aorta, pulmonary artery, trachea, esophagus and heart appear within normal limits. There is no mediastinal or hilar lymphadenopathy.
>
> There is no pneumothorax, pleural effusion or focal airspace consolidation. There is a calcified right basilar granuloma and there are several right hilar calcified granulomas consistent with remote granulomatous infection. Central and segmental airways appear patent. There are no suspicious lung nodules. There is no significant pleural disease.
>
> Superficial soft tissues appear unremarkable. Underlying musculature is within normal limits. There are no acute osseous abnormalities. No destructive bone lesions. Limited images of the

> upper abdomen demonstrate no acute findings. There are mild
> thoracic degenerative changes.

(*Id.*)

On April 12, 2019, Claimant presented to his primary care provider and was noted as denying "nasal discharge, sinus congestion, . . . chest pain/pressure, dyspnea, edema, exercise intolerance, fatigue, orthopnea[,] . . . cough []pleuritic pain, productive septum and wheezing." (*Id.* at 1449–50.)   Upon examination, auscultation revealed "overall: breath sounds clear bilaterally." (*Id.* at 1450.)  On April 24, 2019, Claimant presented to urgent care complaining of chest pain.  (*Id.* at 1355.)  He was marked as negative for symptoms including congestion, shortness of breath, and wheeze and was administered a nebulizer treatment.  (*Id.*)  A respiratory exam following the treatment showed "no respiratory distress, normal lung sounds bilaterally, . . . no rales, no rhonchi[,] [and] mild wheezes over right upper lung field." (*Id.*)  His oxygen saturation was 94% and it was noted that he "tolerated [the] procedure well." (*Id.*)  He was prescribed antibacterial, antiinflammation, and bronchodilator medications and received an immune suppressant injection.  (*Id.* at 1354–55.)

On June 10, 2019, Claimant reported to his pain management provider and was noted as reporting "no chest pain, . . . no shortness of breath, no cough, . . . no wheezing, no chest tightness, and no pain with respiration."  (*Id.* at 1394.)  Upon examination, Claimant showed no dyspnea with respiratory effort.  (*Id.*)  On July 8, 2019, Claimant returned to his pain management provider and was noted as denying "chest pain/pressure, dyspnea, edema, exercise intolerance, fatigue, orthopnea[,] . . . cough, dyspnea, pleuritic pain, productive sputum and wheezing."  (*Id.* at 1456.)  Upon examination, auscultation showed "few, scattered wheezes."  (*Id.* at 1457.)  On the same day, Claimant returned for treatment by Dr. Yazdani and was noted as "complaining of developing upper airway cough syndrome which has resulted into significant worsening of his breathing he is

having shortness of air mostly on exertion and activity and he is currently coughing up some clear sputum." (*Id.* at 1478.) Claimant reported that "[h]e still has shortness of air on activity and exertion which is related to moderate exertion [and] gets worse with exertion gets better with rest gets better with inhalers." (*Id.*) However, he also reported "that he has improved and he is feeling a lot better today than he has been feeling previously." (*Id.*) Upon examination, Dr. Yazdani found Claimant's throat clear, with indications of sleep apnea and "very broad uvula . . . ." (*Id.* at 1479.) Claimant's lungs were found with "[s]cattered sibilant rhonchi with crackles." (*Id.*) Dr. Yazdani instructed him to quit smoking and to correct his reportedly non-compliant inhaler use and ordered Claimant to follow up in two months. (*Id.* at 1479.) On August 8, 2019, Claimant returned to his pain management provider and upon examination showed no dyspnea with respiratory effort. (*Id.* at 1382.) No subsequent medical evidence pertinent to Claimant's respiratory impairment was in the record at the time of the ALJ decision. (*See id.* at 439– 40.)

Taken as a whole, the medical evidence discussed above shows a continuation of chronic severe respiratory impairment with episodic acute exacerbation offset by continual reports of improvement with medication and otherwise unremarkable clinical findings. This is generally consistent with ALJ Morholt's description of no "material worsening . . . and stabilized respiratory function with conservative treatment." (*Id.* at 17.) Aside from highlighting several acute findings from March and June 2018, Claimant does not offer any showing that ALJ Morholt's evaluation of the medical evidence is inconsistent with the record as a whole nor does he explain how those acute findings demonstrate a material deterioration of the "severe respiratory . . . impairments" that ALJ Pickett extensively summarized less than two years earlier. (*Id.* at 483). There is no indication that ALJ Morholt disregarded the acute findings in his review of the medical evidence, and in his discussion thereof he cited the exhibit containing the records that now Claimant

17

highlights.  (*Compare* DN 19, at PageID # 1590–91 (citing exhibit B5F), *with* R. at 17 (citing exhibit B5F).)   Although ALJ Morholt did not discuss all evidence related to Claimant's respiratory impairment, he was not required to do so.  "An ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party.  Nor must an ALJ make explicit credibility findings as to each bit of conflicting testimony, so long as his factual findings as a whole show that he implicitly resolved such conflicts."  *Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. App'x. 496, 508 (6th Cir. 2006) (quoting *Loral Defense Systems-Akron v. N.L.R.B.*, 200 F.3d 436, 453 (6th Cir. 1999)).  As long as substantial evidence supports the ALJ's decision, the Court must defer to it, even if there is substantial evidence in the record that would have supported an opposite conclusion.  *See Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004).  The Court finds that ALJ Morholt's evaluation of the medical evidence of Claimant's respiratory impairment is supported by substantial evidence and is therefore not a basis for remand.

### ii.  Opinions of Dr. Saranga and Dr. Kavka

Claimant challenges ALJ Morholt's evaluation of Dr. Saranga's and Dr. Kavka's RFC findings. (DN 19, at PageID # 1589–91.) Specifically, Claimant suggests that ALJ Morholt should have adopted their limitations for standing and walking and exposure to fumes, odors, dust, gases, poor ventilation, and hazards.  (*Id.*)  Claimant does not cite any authority providing that failure to adopt those limitations constitutes a reversible error.   Instead, Claimant raises two potential deficiencies in ALJ Morholt's evaluation of Dr. Saranga's and Dr. Kavka's opinions that he contends renders his disability determination not supported by substantial evidence.  (*Id.*)  *First*, Claimant asserts that the ALJ Morholt "was wrong" and "errs" in failing to specifically discuss the aforementioned limitations in his decision.  (*Id.* at 1591.)  Claimant does not offer any authority

that would require ALJ Morholt to discuss the limitations nor does he explain how the lack of such discussion undermines his disability determination. *But see Mitchell v. Comissioner of Soc. Sec.*, No. 2:20-CV-13414, 2021 WL 6881862, at *11 (E.D. Mich. Dec. 14, 2021), *report and recommendation adopted in part, rejected in part on other grounds sub nom. Mitchell v. Comm'r of Soc. Sec.*, 2022 WL 265869 (E.D. Mich. Jan. 28, 2022) (citing 20 C.F.R. §§ 404.1520c(b)(1), 416.920c(b)(1)) (emphasis added in original) ("[T]he regulations do not require ALJ[]s to discuss every medical opinion from each medical source individually—they require ALJs to discuss the opinions of each medical source, "*together* in a single analysis...."). Therefore, the Court deems any objection on this ground waived. *See United States v. Layne*, 192 F.3d 556, 566 (6th Cir. 1999) (quoting *McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997)) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived."); *see also Brindley v. McCullen*, 61 F.3d 507, 509 (6th Cir. 1995) (observing that "[w]e consider issues not fully developed and argued to be waived."); *Rice v. Comm'r of Soc. Sec.*, 2006 WL 463859, at *2 (6th Cir. 2006) (unpublished opinion).

*Second*, with respect to Dr. Saranga's and Dr. Kavka's RFC limitation for exposure to irritants, Claimant asserts that ALJ Morholt "should have given the finding great weight." (R. at 1591.) As Claimant notes, ALJ Morholt discounted Dr. Saranga's and Dr. Kavka's opinions to the extent that they were inconsistent with ALJ Pickett's RFC determination because he found no worsening in Claimant's physical impairments in the interim. (*Id.* at 18.) Claimant contends that Dr. Saranga's and Dr. Kavka's exposure limitation was supported, as set forth in their reports, by "Severe COPD, Cervical & lumbar DDD & OA," and further contends that, "[c]ontrary to the ALJ's assertion, the medial [sic] evidence of record documents a worsening in breathing impairment." (*Id.* at 1590–91.) As was discussed in Part II.D.1.i above, the ALJ's finding of no

worsening in Claimant's respiratory impairments is supported by substantial evidence.  Regardless of whether Dr. Saranga's and Dr. Kavka's exposure to irritants limitation was supported by the record, he was not required to adopt that limitation and was permitted to favor alternative well-supported findings.  Claimant does not suggest that ALJ Pickett's RFC determination was unsupported or otherwise deficient.  Moreover, even if Claimant had met his burden of showing that ALJ Morholt erred in failing to adopt a limitation for exposure to irritants, he has offered no showing that this limitation is inconsistent with the job titles identified at Step 5 or otherwise establishing that the error was harmful.  Therefore, Claimant has not met his burden of showing that ALJ Morholt's evaluation of Dr. Saranga's and Dr. Kavka's opinions is a basis for remand.

### 2.  Mental RFC

In evaluating the alleged symptoms that Claimant attributes to his mental impairments, ALJ Morholt considered the medical evidence as follows:

> Further review of the medical evidence reflects the claimant's admission to staff with Communicare that he was doing well in early May 2018 despite a little depression and a couple of panic attacks. He further reported medication effectiveness in stabilizing his mood, and his mental status exams showed no significant abnormalities. He then asserted having instances of outbursts in late May 2018 and June 2018, with feelings of depression and anxiety. However, the claimant's medication management notes from Communicare dated after that time and through January 2019 convey a resolution in his anger while on medication, decreased symptoms of anxiety and depression with medication use, and unremarkable mental status findings outside of depressed and/or anxious mood. There is also no indication that he required inpatient admission or experienced a significant decline in functioning (Exhibits B11F and B18F).

> Despite documented improvement, the claimant was discharged from Communicare in July 2019 because he kept only one session after the development of his most recent treatment plan. He was advised to, "[r]eturn to services, if needed" (Exhibit B24F).

(R. at 17.)

The ALJ also considered opinion evidence and prior administrative findings in the record, including the mental evaluations of state agency reviewing consultants Tonya Gonzalez, PhsyD ("Dr. Gonzalez") and Alex Guerrero, M.D. ("Dr. Guerrero").  (*Id.* at 18.)  On December 4, 2018, Dr. Gonzales conducted a psychiatric review and found mild limitations in ability to understand, remember, or apply information and adapt or manage oneself and moderate limitations in ability to interact with others and concentrate, persist, or maintain pace.  (*Id.* at 518, 522–24.)  He found that Claimant had a mental RFC to (1) "Understand and remember simple and detailed instructions"; (2) "Sustain attention for extended periods of two hour segments for simple tasks"; (3) Tolerate occasional (not more than 1/3 of the time) contact with coworkers, supervisors, and the public"; and (4) "Adapt to routine changes as needed within the above parameters."  (*Id.* at 524.)  On February 19, 2019, Dr. Guerrero reviewed and affirmed Dr. Gonzalez's findings.  (*Id.* at 561–62, 567–68.)  ALJ Morholt found their opinions persuasive, explaining:

> The consultants supported their opinions with a thorough review of the available evidence at the time of formation. Those opinions are also consistent with subsequently obtained evidence. Specifically, and despite his subjective complaints, there is no indication that the claimant required inpatient admission for psychiatric reasons. Furthermore, multiple providers in different facilities documented the effectiveness of medication use and individual behavioral health therapy, with progressive improvement on mental status exams.

(*Id.* at 18.)

As is set forth in his Finding 5, ALJ Morholt adopted Dr. Gonzalez's and Dr. Guerrero's mental RFC findings.  (*Id.* at 16, 18.)  Claimant argues that this RFC does not properly account for medical evidence of more severe mental impairments and improperly relies on dated medical opinions of Dr. Gonzalez and Dr. Guerrero.  (DN 19, at PageID # 1591–92.)

### i.   Medical Evidence of Mental Impairments

Claimant argues that in evaluating Claimant's mental RFC, ALJ Morholt did "not give proper consideration to [mental health treatment] records from Communicare." (*Id.* at 1592.) Claimant notes that the ALJ's discussion of the medical evidence describes "resolution in anger while on medication, decreased symptoms of anxiety and depression with medication use, and unremarkable mental status findings outside of depressed and/or anxious mood." (*Id.* (citing R. at 17).) Claimant then points to other portions of his treatment records that paint a gloomier picture of his mental health. (*Id.*) Claimant does not cite any authority or otherwise identify how ALJ Morholt's review of the medical evidence constitutes a reversible error, but he seems to suggest that he ALJ cherry-picked the record.

As a starting point, "[a]lthough required to develop the record fully and fairly, an ALJ is not required to discuss all the evidence submitted, and an ALJ's failure to cite specific evidence does not indicate that it was not considered." *Simons v. Barnhart*, 114 F. App'x 727, 733 (6th Cir. 2004) (quoting *Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000)); *see also Thacker v. Comm'r of Soc. Sec.*, 99 F. App'x 661, 665 (6th Cir. 2004) ("An ALJ need not discuss every piece of evidence in the record for his decision to stand."). However, the Court examines the record as a whole, including whatever evidence "in the record fairly detracts from its weight," without "resolv[ing] conflicts in evidence or decid[ing] questions of credibility" to determine whether an ALJ's decision is supported by substantial evidence. *Conner v. Comm'r of Soc. Sec.*, 658 F. App'x 248, 253 (6th Cir. 2016) (quoting in part *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990) and citing *Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 713 (6th Cir. 2012)). Thus, where an ALJ has "improperly cherry picked evidence" instead of "more neutrally weighing the evidence," his or her decision is unlikely to be supported by substantial evidence. *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 284 (6th Cir. 2009); *see Brooks v. Comm'r of Soc. Sec.*, 531 F. App'x 636, 641 (6th

Cir. 2013) ("[S]ubstantiality of evidence evaluation does not permit a selective reading of the record.").

As an initial matter, there is no indication, nor does Claimant suggest any, that ALJ Morholt's summary of Claimant's mental health treatment records in any way inaccurate. The Court has reviewed the records and finds that the ALJ's summary is entirely substantiated thereby. Additionally, the ALJ did not ignore significant conflicting evidence; in fact, he specifically mentioned most of the examples that Claimant now emphasizes. For example, Claimant stresses that in June 2018, he was reported as "getting more violent with his outbursts and they are more often" and noted "to be depressed, anxious/fearful, irritable," which mirrors ALJ Morholt's discussion of "instances of outbursts in late May 2018 and June 2018, with feelings of depression and anxiety." (*Compare* DN 19, at PageID # 1592, *with* R. at 17.) Additionally, Claimant points to a January 2019 evaluation as "indicat[ing] mood is abnormal, mood problem is anxious/fearful, affect is abnormal, affect problem is labile," while the ALJ recognized that records through January 2019 showed "unremarkable mental status findings outside of depressed and/or anxious mood." (*Id.*) Finally, it is not clear that any unmentioned portions of Claimant's mental health treatment records constitute contrary evidence because Claimant has not explained how any of the medical evidence undermines ALJ Morholt's mental RFC determination. Notably, ALJ Morholt departed from ALJ Pickett's finding of no mental limitations because he concluded that the subsequent mental health treatment records demonstrated "newly-onset severe mental impairments[.]" (R. at 17.) The Court has independently reviewed the record and finds that it does not fairly detract from the ALJ's RFC determination and therefore cannot conclude that the ALJ failed to meet his duty to consider the record as a whole.

### ii. Opinions of Dr. Gonzalez and Dr. Guerrero

Claimant challenges ALJ Morholt's finding that Dr. Gonzalez's and Dr. Guerrero's mental RFC findings were persuasive and asserts that his decision "fails to recognize that these consultants did not have the opportunity to review important evidence of record at the time of ALJ decision." (DN 19, at PageID # 1591.)  Claimant cites to exhibits that were entered into the record after the latter of the two consultative evaluations dated February 19, 2019, specifically, seven mental health treatment progress notes dated from May 2018 to January 2019 and a mental RFC evaluation completed by Amy Nunn, APRN ("Nurse Nunn") on November 13, 2019.  (*Id.* at 1591 (citing R. at 1323–52, 1490–94).)

As an initial matter, contrary to Claimant's assertion, ALJ Morholt expressly recognized that Dr. Gonzalez and Dr. Guerrero did not review the entire record: "The consultants supported their opinions with a thorough review of the available evidence at the time of formation. Those opinions are also consistent with subsequently obtained evidence." (R. at 18.)  Regardless, "it is not error for an ALJ to rely on medical opinions from physicians who have not reviewed the entire record so long as the ALJ considers the post-dated evidence in formulating her opinion." *Edwards v. Comm'r of Soc. Sec.*, No. 1:17 CV 925, 2018 WL 4206920, at *6 (N.D. Ohio Sept. 4, 2018) (citing *McGrew v. Comm'r of Soc. Sec.*, 343 F. App'x 26, 32 (6th Cir. 2009) (indicating that an ALJ's reliance upon state agency reviewing physicians' opinions that were outdated was not error where the ALJ considered the evidence developed post-dating those opinions)).  Here, ALJ Morholt extensively discussed the updated medical records and explained why he found that Dr. Gonzalez's and Dr. Guerrero's earlier findings were consistent with those records.  (R. at 17–18.) Therefore, ALJ Morholt was permitted to rely on those findings in his mental RFC determination. *See Spicer v. Comm'r of Soc. Sec.*, 651 F. App'x 491, 493–94 (6th Cir. 2016) (quoting *Blakley v.*

24

*Comm'r of Soc. Sec.*, 581 F.3d 399, 409 (6th Cir. 2009) ("[A]n ALJ may rely on the opinion of a consulting or examining physician who did not have the opportunity to review later-submitted medical records if there is 'some indication that the ALJ at least considered these facts' before assigning greater weight to an opinion that is not based on the full record.").

Claimant also references the following quotation from *Deskin v. Comm'r of Soc. Sec.*, 605 F. Supp. 2d 908, 911 (N.D. Ohio 2008): "Where the ALJ proceeds to make the residual functional capacity decision in the absence of a medical opinion as to functional capacity from any medical source, or . . . with one made without the benefits of a review of a substantial amount of the claimant's medical records, there exists cause for concern that such substantial evidence may not exist." (DN 19, at PageID # 1591–92.)  In *Deskin*, the Northern District of Ohio held that an ALJ may make a "commonsense judgment about functional capacity even without a physician's assessment," but only when "the medical evidence shows relatively little [] impairment."  605 F. Supp. at 912 (quoting *Manso-Pizarro v. Sec'y of Health & Hum. Servs.*, 76 F.3d 15, 17 (1st Cir. 1996)).  However, it clarified that when "making the residual functional capacity finding, the ALJ may not interpret raw medical data in functional terms."  *Id.*; *see also Branscum v. Berryhill*, No. 6:17-CV-345-HAI, 2019 WL 475013, at *11-12 (E.D. Ky. Feb. 6, 2019) (citing *McGranahan v. Colvin*, No. 0:14-CV-83-JMH, 2015 WL 5828098, at *3 (E.D. Ky. Oct. 1, 2015)).  The *Deskin* court articulated the rule as follows:

> [W]here the transcript contains only diagnostic evidence and no opinion from a medical source about functional limitations (or only an outdated nonexamining agency opinion), to fulfill the responsibility to develop a complete record, the ALJ must recontact the treating source, order a consultative examination, or have a medical expert testify at the hearing.

*Deskin*, 605 F. Supp. 2d at 912.  The "*Deskin* rule" narrowly applies in only two situations: "(1) where an ALJ made an RFC determination based on no medical source opinion; or (2) where an

ALJ made an RFC determination based on an outdated source opinion that did not include consideration of a critical body of objective medical evidence." *Branscum*, 2019 WL 475013, at *11 (quoting *Raber v. Comm'r of Soc. Sec.*, No. 4:12-CV-97, 2013 WL 1284312, at *15 (N.D. Ohio Mar. 27, 2013)); *see also Kizys v. Comm'r of Soc. Sec.*, No. 3:10-CV-25, 2011 WL 5024866, at *2 (N.D. Ohio Oct. 21, 2011).

Claimant does not explain how the later-admitted records he cites constitute a critical body of the objective medical evidence.  The seven later-admitted mental health treatment progress notes dated May, June and December 2018 and January 2019 are only a scattered fraction of Claimant's treatment records over the relevant period.  Indeed, at the time of that Dr. Gonzalez's and Dr. Guerrero's evaluations, the record included other progress notes from *the same provider*, including those dated over January, March, August, September, and October 2018.  (R. at 1204–52.)  Dr. Gonzalez's and Dr. Guerrero's reports discuss some of these records and explicitly mention findings consistent with the "important evidence" that Claimant complains went unconsidered.  (*Compare* DN 19, at PageID # 1592, *with* R. at 561.)  With respect to the other later-admitted "important evidence," Nurse Nunn's November 13, 2019 RFC evaluation is five pages in length; three of those pages contain no objective medical evidence and are limited to functional assessments.  (R. at 1490–94.)  The other two pages document reported symptoms during an initial intake interview and note a treatment plan prescribing mood stabilizing and antipsychotic medications.  (*Id.* at 1490–91.)  Again, this evidence is cumulative of the treatment records discussed in Dr. Gonzalez's and Dr. Guerrero's reports.  In sum, the Court finds no indication that the later-admitted medical evidence was critical to the reviewing consultants' mental RFC evaluation.  ALJ Morholt was not required to order a new mental evaluation to consider the subsequent medical evidence.  An ALJ is only required to request additional evidence

when she lacks enough evidence to make a determination.   ALJs have broad discretion to determine whether further evidence is necessary.  *See* 20 C.F.R. § 404.1517 (2001).  This does not remove the claimant's burden to provide sufficient medical evident to support his claim.  *See Jones v. Comm'r of Soc Sec.*, 336 F. 3d 469, 474 (6th Cir. 2003).   The Court notes that Claimant was given an opportunity to review the record before the hearing, and when asked if the record was complete, his counsel said that it was.  (*Id.* at 439–40.)   Based on the foregoing, the Court finds that ALJ Morholt's evaluation of Dr. Gonzalez's and Dr. Guerrero's opinions is supported by substantial evidence and is therefore not a basis for remand.

### iii.  Opinion of Nurse Nunn

Claimant argues that in evaluating Claimant's mental RFC, ALJ Morholt "fail[ed] to give proper consideration of the opinion of Amy Nunn, APRN."  (DN 19, at PageID # 1592.)   In his RFC analysis, ALJ Morholt considered the opinion of Nurse Nunn.  (R. at 18.)  On November 13, 2019, Nurse Nunn completed a mental RFC assessment based on an intake interview with Claimant the day before.  (R. at 1490–94.)   Among a list of twenty-five mental abilities and aptitudes, Nurse Nunn found Claimant "[u]nable to meet competitive standards" for five and with "[n]o useful ability to function" for the remaining twenty.  (*Id.* at 492–93.)   Nurse Nunn found extreme limitations in social functioning and maintaining concentration, persistence, or pace.  (*Id.* at 493–94.)  ALJ Morholt noted that these findings "suggest[] that the [C]laimant was so limited in the four broad areas as to meet the mental health listing."  (*Id.* at 18.)  ALJ Morholt found Nurse Nunn's opinion unpersuasive, explaining: "Aside from being wholly inconsistent with the medical evidence showing rapid improvement to the point of stability after medication adjustment, there is no evidence that the claimant ever required inpatient hospitalization for mental health reasons. Furthermore, Ms. Nunn based her opinions on a single initial intake session at her clinic (Exhibit

B26F).” (*Id.* at 18.)  Claimant does not cite any authority or otherwise identify how ALJ Morholt's evaluation of Nurse Nunn's opinion constitutes reversable error, but his argument suggests that ALJ Morholt improperly deemed her opinion inconsistent with the medical evidence in the record. For example, Claimant asserts that his mental health treatment “records do not support the ALJ's conclusion . . . .” (DN 19, at PageID # 1592.)  As was discussed in Part III.D.2.i above, the ALJ's assessment of Claimant's mental health treatment is supported by the record.   Furthermore, treatment records showing Claimant receiving ongoing mental health treatment and medication therapy before being discharged in July 2019 to return as needed are plainly inconsistent with Nurse Nunn's findings of near total inability to function due to mental health symptoms.  Claimant also suggests that the ALJ improperly relied on the absence of in-patient psychiatric treatment, asserting, “[h]ospitalization is not the standard for disabling mental impairment.” (*Id.*)  While hospitalization may not always be relevant to the Step 4 analysis, the absence of such is illustrative of a history limited to conservative mental health treatment.   The Sixth Circuit “ha[s] often concluded that ALJs properly discounted the opinions of [] physicians where the opinions were incompatible with the claimant's generally conservative course of treatment or activities of daily living.” *O'Brien v. Comm'r of Soc. Sec.*, 819 F. App'x 409, 417 (6th Cir. 2020) (collecting cases). An ALJ may properly rely on the intensity of past treatment as inconsistent evidence of an alleged mental impairment so long as it is not “determinative factor in a credibility assessment[.]” *Strong v. Soc. Sec. Admin.*, 88 F. App'x 841, 846 (6th Cir. 2004) (quoting *Blankenship v. Bowen,* 874 F.2d 1116, 1124 (6th Cir.1989)).  Here, in evaluating the persuasiveness of Nurse Nunn's opinion, ALJ Morholt relied on conservative treatment history, i.e. no past hospitalization, in addition to “medical evidence showing rapid improvement to the point of stability after medication adjustment” and the fact that she “based her opinions on a single initial intake session at her clinic.”

(R. at 23.)  Finally, while it is true that psychiatric hospitalization is not a prerequisite for disability, Claimant "cites no evidence that indicates that [his providers] w[ere] unable or unwilling to provide him with more aggressive treatment options for [mental health] symptoms."  *Dooley v. Comm'r of Soc. Sec.*, 656 F. App'x 113, 120 (6th Cir. 2016).  Based on the foregoing, the Court finds that ALJ Morholt's evaluation of Nurse Nunn's opinion is supported by substantial evidence and therefore is not a basis for remand.

### 3.  Findings 10 and 11

Claimant objects to ALJ Morholt's Findings 10 and 11 on the grounds that they are not supported by substantial evidence based on Claimant's contention that ALJ Morholt's RFC determination did not account for all physical and mental limitations.  (DN 19, at PageID #1593–94.)  In light of the Court's findings above, these objections are without merit.

### III.  ORDER

For the reasons set forth above, **IT IS HEREBY ORDERED** that the final decision of the Commissioner is **AFFIRMED**.  A final judgment will be entered separately.

Colin H Lindsay, Magistrate Judge
United States District Court

August 31, 2022

cc:  Counsel of record